May it please the court. Pretty quick. Good morning. Deputies Jackson and Bawden acted reasonably on March 12th of 2016 when they made the decision to enter the apartment and Deputy Jackson specifically placing himself in a individual area defined as defendant Curlie Quarterman and based on the totality of circumstances that they were faced in that relatively short period of time from the time they arrived on this scene until the time they entered the apartment was not more than three minutes they were faced with a situation that is highly volatile inherently dangerous and as two experienced deputies acted object in an objectively reasonable fashion and making the decision to enter the apartment and ultimately search Curlie Quarterman and see doesn't sound like what they observed was volatile it's I mean that the description is described by the mother down on the street made it potentially volatile but did they see anything that was volatile when they description of the prior events from Carol Bach when the door opens to the apartment and I think what escalates this even quicker to one two three go for these two deputies is as soon as that door opens Deputy Bawden observes Curlie Quarterman on the couch and what they see is he is trying to scoot and get up and he's fidgety and a real and Deputy Bawden an 18-year experienced deputy in his mind thinks he's a fight-or-flee type defendant wait a minute that was the blading came later the blading came after that I'm yeah but when the door was opened Deputy Bawden describes that while Deputy Jackson and Deputy Bawden are out in the hallway he sees Curlie Quarterman over to the right on a couch and as soon as Deputy Jackson first asked may we step in almost immediately on the tape you hear Deputy Bawden say no no don't you move so fast and he described during the hearing what that was result of is as soon as the door opens and he sees Mr. Quarterman he sees him scooting trying to get up to from the couch and later described as fidgety which he describes based on his experience. That's not volatile. To him it was a fight-or-flee response and to an individual that he knew. That soon? Because he's standing up when police enter the apartment? Well what makes it volatile is he knows that there's an individual in there with a gun that they've been informed earlier. I'm objecting to the word I mean I agree I grant you potentially volatile but I think the whole point of the district court's opinion is what he saw what they saw when they came in the room was far different than what the complaining mother might have led them to believe they would see. Well volatile to the point if they have an individual that may have a gun that's getting up as soon as he sees police deputies at the door and that's all that volatile I can I can see that I certainly would consider it potentially dangerous. Yes but I think what's most important is Deputy Bawden's reaction he's saying no no don't you move so fast. No they have to be objectively reasonable. Yes and he's seeing that situation to him it's an individual that is getting up in a fight-or-flee response he says at this point in time because the door had just opened Mr. Quarterman did not know. If he's an overly jittery police officer he nonetheless gets qualified immunity? I'm sorry. If he if he is an if he is an excessively jittery or skittish police officer he gets qualified immunity? No I don't think Deputy Bawden was a jittery or nervous deputy in this situation. They're approaching this apartment after it was reported that there was an individual that drove Carol Bach out of there with the gun on its hip by getting in her face and he didn't exchange. Do they enter at the no no don't you move so fast statement? Do they enter the room at the no no don't you move so fast? They do not. Are you sure? Yes. Okay. Deputy Jackson initially in a transcript of the hearing he originally makes this statement of may we step in it's almost immediately after that that Deputy Bawden says no no don't you move so fast. And she says what's wrong what's wrong? They described as what she says. Yeah yeah yeah go ahead. And the testimony Deputy Bawden at this point they're still out in the hallway. Deputy Jackson attempts to. This is all this is a 22nd time period that you're slicing and dicing here. Exactly. We're going to come in for a few minutes is that when they actually enter that that statement? Yes. Deputy Jackson describes that that's when he takes a step in which is he makes a very limited intrusion but he does take takes two steps in and places himself between Christina Bach and the defendant. Of course the defendant said there's some place before they step in you're telling me I don't have a gun. He denies having a gun. Yes. It's had to be quick. Yeah and again but I think his reaction to those deputies is I think is what makes these deputies even more nervous. I mean they're they knock on the door they don't announce who they are. So he doesn't know those deputies are that these are deputies at his door. His immediate reaction to that is he doesn't interpret that as trying to get up and get away or at this point because it's so early in the encounter they don't know if there's a second person in there. They know someone in there has a gun and someone earlier had that gun and got in a heated argument with Carol Bach and drove her out of the apartment to the point of she was called 9-1-1 out of fear for her safety. Did he deny having the gun before they entered? Yes. Yes. I think right after the statement that Mrs. Benton was referring to Deputy Jackson tries to say where's the male half where's and explains them that someone has stated that there's an individual in there with a gun and he originally denies that. They didn't say they were coming in to look for someone else being there. He did not. They didn't say we're told there's somebody with a gun in here and if it's not you were coming in to find them. They did not say those exact words. So you're ex-post factoring what they why they were why they entered and what they did. No, but they explained their reasoning for going in. I mean this is 20 seconds so I mean . . . I thought the reason to go in that Jackson went in was to get between the daughter and the defendant. Pure and simple. Yes, for safety reasons. The safety reasons is . . . Now you're elaborating on what was . . . I haven't read all the testimony but your description of what of their motivation is different than than Jackson's quoting and the materials. Deputy Jackson testified that when he stepped in to place himself between Christina Bach and Curley Kortum and he did that because of his fear of safety or as he described . . . And if he was it would be a lot more serious Fourth Amendment case. At that point he does not say he is going in to sweep the apartment. He's going in to take . . . Why don't you just defend what they did? I can't even tell from the district court's opinion what the court thought the Fourth Amendment violation was. How do you construe the opinion? They found that the officers . . . No, they. This is one district court concluded what? What was the objectively unreasonable Fourth Amendment violation? That they did not have . . . The court rattled off three or four things that seemed unreasonable but never clarified, as I read it, what the violation was. How did you interpret it? That they were finding all these things that did not happen and that were not said . . . No, no. The Fourth Amendment cares about entries. It cares about searches. It cares about pat-downs. It doesn't care about motivation and what people suspect and so forth except as that provides justification for actions which are alleged to violate. I thought this seems to be briefed like a wrongful entry case, but then we move on to a wrongful search without even focusing on whether . . . If this is a Terry Frisk, then obviously they can remove a gun from a holster on his hip, right? Yes. How does the district court get to saying that there was an unlawful search and seizure from the defendant personally when the court is apparently unhappy with the entry? If you focus on the Fourth Amendment issues, it's a lot better than the speculation about who did what and why other than their testimony. The district finds that exigent circumstances did not exist and that the officer did not have a probable cause. The standard for the . . . To do what? To enter. If they didn't have probable cause to enter, but they entered and something then happened to give them reasonable suspicion that the defendant needed a pat-down . . . I believe that the court opinion was that they did not have . . . The court just said everything was wrong here, but let's break it down. You've got . . . What's wrong with the search? Was it an arrest search? I don't think so. I think it's focused . . . The district court order is focused on the entry itself because once they're in there . . . She usually says enter and search. Yes. Here, officers like probable cause to enter and search. She says that several times. She puts the two together. Yes. Once they enter, they have to have to enter according to district court exigent circumstances and probable cause. Is it both exigent circumstances and probable cause to enter? I think based on prior opinions, I think there's opinions that . . . You can't enter with exigent circumstances alone? I think there's two types of scenarios. There's the immediate aid. Someone's dying or in there where they can . . . It seems to see that the case law says you can enter without probable cause. In these type of situations where there's a warrantless search for evidence of a crime, it seems to be more the opinions look to exigent circumstances and probable . . . Counsel, was the community caretaking exception to the warrant requirement ever briefed to the district court? No. She doesn't mention it. You all didn't brief it to her? No. It's not briefed on appeal either, huh? No. Is there a reason for that? Well, I think the officers went there more for an investigative purpose than an aid purpose originally. They went up there. They were concerned for the safety of Christina Bach, and that's why they went up there. Not because they thought someone was hurt at that point in time. Why wouldn't that be an aid situation? Well, they didn't know until they got up there. Therefore, why wouldn't that be an aid situation? Well, most of the cases appear to be someone that they know has been bloodied or there was a gun. They already knew what was in there that was left behind. Someone's sick and needs immediate aid. Those type of community caretaking functions. There's some public need for it. It's not an investigating of an assault with a weapon type. Boy, there are some community caretaking cases that look just like this case. Look a heck of a lot like this case, and that wasn't briefed to the district court? No. I wanted to reserve some of my time for rebuttal, but I'm happy to answer more questions if there are at this point. Thank you. Thank you. May it please the court? I'd like to start by addressing where Mr. Westphal left off. I thought about this and the violation and what needed to be established to justify the entry when I was briefing and again preparing for the warrant requirement with exigency type situations. You're saying the entry is the problem here? Yes, Your Honor. Why can't they have Fourth Amendment a reasonable basis to see and seize that gun in his holster, even if the entry was unlawful? I go to the district court made it clear that you don't claim the police for creating circumstances that then make their next conduct reasonable, and that seems to me what the district court's doing here. No, Your Honor. I think as Mr. Westphal has acknowledged and what appeared to me to be conceded from the very beginning at the district court was that this was an investigative entry, and both exigent circumstances and probable cause are required. At this stage of the case, it would be improper to rely on some other kind of community caretaking or emergency aid where it's just about exigency alone. Well, then it would come up later. I'm sorry? Well, this isn't the end of the case, right? It's the denial of qualified immunity, and the issue remains until all the way through trial. At the end of the trial, the government having gotten its act together will renew the request for qualified immunity. No, Your Honor. This is a government appeal of a grant of a motion to suppress at the district court. Okay. You're right. You're right. A felon in possession, right? You're right. You're right. Yes. Yes. But I'm still right it continues through trial. No, Your Honor. I would assert that this is waived, that this argument to try and justify . . . You don't have any case support for that. If the circumstances, if something is learned during trial that affects the suppression ruling, it can be certainly be revived by the defendant. I don't know why it can't be revived by the government. Your Honor, in the First Circuit case called Romaine, that was a government appeal where it was about an unlawful entry into an apartment. Below the government, at the district court, the government had argued standing and then failed to raise it on appeal. There, the First Circuit Court of Appeals determined that that was waived. They weren't going to address it just because of error preservation principles and preserving the argument. Why does this get characterized as an investigatory situation? There wasn't an ongoing drug case or an ongoing gun case against them. They were there on a domestic violence or domestic dispute issue. Well, I would disagree with that characterization as the district court did. It's correct that when these exigent circumstances cases or emergency aid, community care taking, generally, law enforcement here receive a report of something that's obviously volatile. Somebody has been hurt. Somebody is being threatened. That's not what we have here. And then . . . You have Carol Bach saying, he got in my face, he had a gun, he's up there, he's kicking my daughter out. Why isn't that . . . I don't see what the investigative . . . It's not like she said, he's a felon and he has a gun. Then maybe it's investigative. Because exigency requires an immediate threat of harm to the person that is still in the apartment or that someone has been injured. The mother-in-law does say, my daughter has not come out of the apartment. She doesn't say that she's being held against her will. She doesn't say that her daughter has been threatened. She doesn't make any indication that her daughter is in danger in any way. She just indicates that he's breaking up with her. That's inherent in the description. My daughter is trying to get away from a guy with a gun who just . . . who got in my face when I objected. I would disagree, Your Honor. That's what they hear. I mean, sure, after the fact, we learn that, oh, this is all because this was all nice and friendly and she was leaving and so forth and defends her boyfriend. I would disagree with that first characterization, that it would be objectively reasonable to think that. And that's especially just listening to the video or listening to the recording herself. This isn't a mother who's saying, oh, my goodness, my daughter is in danger. Please help her. She's obviously angry. Well, he's in there. He's kicking her out. He got what he wanted. He got in my face. He's got a gun. My daughter's not come out. Right. It doesn't sound like she's afraid or scared for her daughter's safety. And even if it . . . it's not just that. And then what the officers see when they arrive at the apartment as they're . . . of some situation. She sounds somewhat bitter, I would say. As someone who is used to prosecute domestic cases and has listened to a lot of 911 calls, this isn't a mother who is afraid. She's obviously just angry. And angry that . . . she doesn't describe it as, he came at me, he's yelling in my face, I had to get out of there. She describes the two having a heated verbal exchange. And it's not . . . and it's something that's relied upon both for Carole Bock's actions and for the law enforcement's actions. Well, she determined it was worthy of 911 calls, so it must be reasonable. People can be unreasonable all the time. That's why this court demands to determine whether something is objectively reasonable. And that's when the officers need to step in and say, okay, what . . . The officers surely have the right to do a knock and talk, right? You know about knock and talk doctrine, I bet. Right. And there is . . . Okay. So they got the right to do a knock and talk. They get there and they don't enter till after a good bit is said and done. You heard us describe it earlier. Why isn't the . . . remember, the mother-in-law says, gun on hip, all this other stuff. And they say he was moving real quick, hands toward couch. Thought he was getting the gun out of the couch, is the real testimony here. Kind of scooting around. I didn't know what was going on. No, no, don't you move so fast. She says, what's wrong, what's wrong? Boy, don't you think all that's enough? No, Your Honor. Why not? Deputy Bodden indicated that the sun was in his eye and he was a little alarmed because it appears that Mr. Quarterman was standing up quickly. Right. Now, standing up quickly in response . . . Well, reaching in the couch, you're slicing and dicing it a little bit. Let's stick with reaching in the couch. Is that not in the record? I would always defer to the record, but I don't believe so. I think his testimony was, I didn't know if he was doing this. He says, I don't know if the gun's in the couch. He says, I have the word, moving his hands quickly, scooting over, trying to stand up to the couch, reaching in the couch. I think that's in his testimony, counsel. I don't think he's concerned. I think the overall idea is he doesn't know what he might be doing. He's moving quickly and I would acknowledge that and always defer to the record. But I don't think that his first immediate thought was, I thought he was reaching for a gun. It's, I don't know what has happened. Well, I don't know if a gun's in the couch, he says.  We didn't, hadn't made the scene safe. The mother's already told him there's a gun involved. But what they did at that point was that they told him to stop moving and they told him to stay seated. And he complied with that demand and then they stayed outside of the apartment for a period of time before they . . . Boy, seconds, oh, counsel. All this is 20 seconds long. Yes. So it's seconds. Go ahead. Yeah, it does happen fairly quickly. But the objective, reasonable thing to do is to order him to stay seated and not move. So they could take the time to assess the situation and talk with the occupants of the apartment. And they didn't enter at that time. It's not like the general exigent circumstances situations we see from this court where law enforcement . . . There's no such thing as a general exigent circumstance. Go ahead. I mean, take Roberts, Roberts, it's officer safety. Here, Mr. Officer Jackson says it's daughter safety, it's citizen safety. There's no difference, is there, in if a threat is reasonably perceived, it can be, it doesn't matter that it wasn't the police themselves. That the threat wasn't to the police themselves? That the police entered before, before we get to the search, the entry was to put a, put an arm, a uniformed policeman between two people who the mother thought might be having an altercation that could turn physical, including with a firearm. That sounds pretty exigent to me. No, Your Honor, because there is no report of a threat. Well, now, to leave the facts and go to law, what about our Roberts case? You know, several of us were involved in that. What do you think about the Roberts case, this court last year? Do you know what I'm referring to? Yes, I do, Your Honor. Okay. That case is materially . . . It looks a lot like this case. That case is materially distinguishable from the facts that we have here. Roberts involved, the law enforcement believed they were going to find a homicide suspect. Now, that's much different from getting a report that my daughter's ex-boyfriend and I had a heated verbal exchange and he got in my face. So, they're dealing with someone they know is potentially incredibly dangerous. And also, the occupant of that apartment, they had reason to believe was intoxicated and was using controlled substances. Marijuana. Yes. And when they came into the apartment, it appeared that the defendant was high. And also, the defendant . . . He was on a couch. He was on a couch and he . . . He looked scared, nervous, almost to flee. And they get in there immediately. That's correct, Your Honor. Yeah, go ahead. But, unlike in the Rodriguez case, here, the deputy testified that there was nothing abnormal about Mr. Korteman on the couch. That he was just sitting there normally. There was nothing about him that raised . . . I'm sorry, who testified there was nothing? Who did you say testified this way? I'm sorry. One of the deputies. I don't have the site in front of me at this . . . Because, boy, that's not Bowden's testimony. It's page 35 of the suppression transcript. He states that Mr. Korteman was sitting in an ordinary way. Who says that? I'm not sure which deputy it is, Your Honor, but it's on page 35 of it. Boy, mostly it's Bowden that recounts, if that's the way . . . if I'm saying his name right, that recounts all this. That's sure not the point of his testimony. Of his testimony that he . . . Right. Well, that's . . . Sitting there normally, he says the opposite. Moving quickly, reaching the couch, couldn't . . . I read you the junk. Go ahead. Well, I'm referring to when he first opens the door and sees Mr. Korteman. Oh, oh, I'm sorry. Go ahead. And then, the standing up happens. And, of course, this all happens fairly quickly. But, as far as how he appeared when they first opened the door, he looked normal. So, because, in Rodriguez, they . . . the officers knew that they were dealing with a potentially dangerous suspect who was under the influence, it's much different than the facts that we have here. Now, just staying with the law, tell me what Fourth Amendment violations we're reviewing. I . . . I would assert the entry, and that's appeared . . . to me, appeared to be how it was briefed below and continues to be argued on appeal. The way the district court wrote it, though. I'm sorry? So, you're saying that the entry was wrongful and, therefore, the search was poison fruit? Well, I think either way you look at it, Your Honor. The entry was lawful. I want to know the way we . . . the way you think we have to look at it. I think that the way that it's been briefed and conceded by the government as to what exception that this court is . . . can rely upon and what exception . . . the search and seizure of the gun gets suppressed. Because the entry was unlawful, and so everything that occurred after that . . . Well, what case law says that follows like night and day. I'm sorry. Could you repeat the question? Well, you know, we have all kinds of doctrines like intervening causes and events that detach . . . that make subsequent conduct that would otherwise be lawful not suppressible as poison fruit. If you're saying the only . . . if the only violation was wrongful entry, then we have a Wong-Sun issue. Well, the . . . If you're saying the subsequent search and seizure were wrongful, which is kind of the way I read the district court opinion, then we have a second Fourth Amendment . . . independent Fourth Amendment violation to analyze. Now, do you want to say, oh, do both of them or do you have a position on this? I would think either way you look at it, it's wrongful. The entry, then what happened after is unlawful, and if it's two separate violations . . . Okay, so what happens afterward is they now see a holster on his hip and a . . . which presumably is carrying a gun he's denied having, and they're police officers in a home where a investigating, to use your word, a domestic violence scene. What case says that they don't have a Terry authority to pat and frisk and seize that gun? So that's the Ubile's case, and I'm sure I'm pronouncing that incorrectly, that's cited in the brief. And for a Terry frisk, you need reasonable suspicion of criminal activity or that someone is armed and dangerous. I just gave you the reason. Okay, yes, I understand the law. I'm saying why doesn't this situation meet that? Because there's no evidence that he is dangerous, Your Honor. There's nothing unlawful about possessing a firearm in your own home. I didn't see that analysis by the district court. I just saw, well, you know, they're in the room, they shouldn't be there, they seize, so I suppress it. I don't think that . . . but I didn't see a Wong Sung analysis either. Because under these cases where we're determining whether the gun is justified, my reading of the case law is that it's not somehow allowed, if law enforcement is in the apartment improperly, that somehow what they do while they're in there can be justified, especially because nothing intervening happened. They immediately seized him and ordered him to turn around and then saw the firearm. They saw that he was carrying a gun that he denied having. After he was seized, Your Honor. Immediately after entering the apartment. I thought before they even entered, he denied having a gun. He did, Your Honor. Okay, then they see the holster. Okay, they didn't see the gun, they saw the holster. Well, guess what might be in the holster? After they entered the apartment, Your Honor. Right. Well, but that's the whole point. Isn't this a two-step analysis here? What if we think he came in appropriately? Then the question is, is there a bad search? Right? I think that's one way to look at it, Your Honor. Okay, and that's what I didn't see much argument or analysis of that. And I think Judge Loken was just saying, why isn't that a reasonable Terry stop once they see the gun there in these circumstances? Because they didn't initiate the Terry stop after they saw the gun. They seized him and then ordered him to turn around and then saw the gun. It's crystal clear in the record that they didn't see the holster before they seized him. My understanding is that they came in, ordered him to stand up and turn around. And that's when this blading occurs. And then when he does turn around, Deputy Bowden says, you do have a gun. That's my understanding. Of course, I would always defer to the record. The action comes in and puts himself between the daughter and the defendant. Correct. And says, stand up and turn around. Before that, Bowden, I think, had just, as I understand the record, Bowden had said, you know, don't move too fast. What are you doing there? Do you have a gun? Correct. And so Jackson knows Bowden is concerned. Correct. And so Jackson says, stand up and turn around. Correct. And he isn't. And that's not a seizure yet. When he's ordered to stand up and turn around, I would agree that that is, or I would assert that that is a seizure, Your Honor. It's at that point when law enforcement has entered your apartment. I don't think the district court didn't come to that conclusion. I think it's arguable. Correct. But in any event, as he does that, he does it in a threatening, from Bowden's perspective, he does it in a threatening manner, blading, and he exposes a holster on his hip. As he turns around. Now they do their Terry thing. They take control of him and they take the holster. I mean, they don't have to pat him down. They can see what they're concerned about. Even if they saw a firearm, Your Honor, if this is a Terry frisk, and if the court is going to decide it or reach it under that ground, I would ask for the opportunity to brief that issue because I think you're right. It's not really completely discussed. But the question still needs to be whether someone is armed and dangerous. And in that Ubile's case, there was a report of somebody with a firearm. And the Third Circuit said, well, that's not enough. You don't know if that's unlawful, as law enforcement didn't know here. Is that one of your 3109 cases? You cited a bunch of things. Your gun is not enough cases, which I went and read, and they're all 3109 no-knock issues, which are completely off point. No, Your Honor. The Ubile's case was someone was just, I think, out and about in town, and law enforcement received a report of a firearm, that someone possessed a firearm, and they went and conducted a Terry frisk. And they said, well, we don't know anything about that as being unlawful. We've had a case like that. We've had a case, an on-the-street case. Right. I think that's the Jones case. This is not an on-the-street case. No, he's in his home, which is an even bigger Fourth Amendment concern, is that they're entering his . . . It's a domestic violence situation, which is even more frightening. I would disagree with that. Oh, I know. You say at the end of your brief, this is not a domestic violence case. Correct. Well, that's your view of it. I'm sure that wasn't the officer's view of it. Well, I would assert that that view is not objectively reasonable, Your Honor. Let me ask you, how was this argued below? Did you argue illegal entry and then one song, or did you argue illegal entry and illegal search and seizure? My reading of the pleadings . . . I was not the public defender below, but my reading of the pleadings was that this was an illegal entry and that the search was therefore illegal. They seized him and searched the firearm. I don't know if Wong-Sun was specifically cited, but yeah. That's the logic. Yes. Okay. If there are no further questions, I would ask that this be adjourned. Thank you. Mr. Westphal? Yeah. Thank you. The defense characterizes the Mother Kerouac as angry and bitter, which is their characterization, but the focus of this and what the government focuses on as an appeal is what the disagreement with the district court is, is not the defense's characterization or even the district court judge's characterization, is what the two deputies, these eighteen-year veterans saw, and whether or not what they saw was objectively reasonable. By their actions, when after they get talked to Kerouac, they immediately go up to the apartment, and because based on her statements to these officers, or these deputies, they believe that there is a dangerous situation, that they need to immediately go up there. Yeah. Okay. You've got us to the knock and talk, which doesn't do anything, which is barely the front end of the case. It's the entry. What did they see when the door was opened and the daughter stepped back that confirmed their concern that this was a potential domestic violence situation? I think they saw a couple things. The main thing, a couple things, important things. I think they saw, Deputy Jackson noted that he saw bags and boxes in there, consistent with Kerouac's statement that she was being forced out, being kicked out of the apartment. I think most importantly, and again . . . That takes two questions to her. Are you leaving, and is he trying to prevent you from leaving? You don't have to go in the room for that. But I think what . . . Right? I mean . . . Yes. Okay. That's almost a slam dunk reasonable thing to do, isn't it? Exactly. Except what escalates this is almost immediately, when that door is opened, is when Curly Quarterman starts making these movements on the couch. And at pages, I think, 59 of the transcript, Deputy . . . I'm sorry, not 59, but . . . Did the daughter testify at the suppression hearing? No. Because it's the objectively reasonable perspective of these two deputies that was the focus of the motion. And as soon as he makes those movements, based on what they know at that point in time, that very quickly, in 20 seconds, yes, is a short period of time when you look at it. But when you're standing in an open doorway with . . . looking for a gun that was used to force the mother out, it's an eternity for these two deputies. And his reaction almost immediately . . . uncomfortable, he was asked why. Because, number one, he doesn't know for sure where the gun is at. He doesn't know if there's . . . Okay. We've been over this six times, and your time is up. So, thank you. Thank you. The case has been thoroughly briefed and argued, and we'll take it under advisement.